In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-2075

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JEREMY J. HUART,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:12-cr-00114-wmc-1 — **William M. Conley**, *Chief Judge.*

ARGUED SEPTEMBER 23, 2013 — DECIDED NOVEMBER 22, 2013

Before EASTERBROOK, SYKES, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Jeremy J. Huart appeals the denial of his motions to suppress pictures found on a cell phone he possessed while serving part of his sentence in a halfway house. Because Huart had no reasonable expectation of privacy in the seized cell phone or its contents, we affirm the district court's decision.

## I.     Background

In 2008 Huart pled guilty to one count of possessing child pornography, and was sentenced to 65 months' imprisonment and three years of supervised release. On May 11, 2011, he was transferred to the Rock Valley Community Program, a privately operated halfway house in Janesville, Wisconsin, that contracts with the Bureau of Prisons ("BOP") to house and supervise a number of federal prisoners who are near the end of their incarceration terms. A copy of the rules governing inmate behavior was provided to Huart upon his arrival. One of these rules stated that "[d]uring intake, all belongings will be searched and inventoried. Any new items brought into the facility or removed from the facility will be reported to staff so the inventory can be adjusted." Huart was not permitted to possess a cell phone at Rock Valley, and the rules governing inmates who were allowed to have cell phones further specified that "ANY STAFF may request at ANY TIME to view the contents of [an inmate's] cell phone with or without reason." Before beginning his stay at Rock Valley, Huart also signed a form entitled "Conditions of Residential Community Programs," which explained that he was "in the custody of the U.S. Attorney General serving [a] sentence." He was also subject to several other conditions, including frequent searches of his living area by Rock Valley staff.

On the morning of August 19, 2011, a Rock Valley employee conducting a random search of Huart's room found an LG model 200 cell phone on his bed. The assistant director of the halfway house searched the phone and discovered approximately 214 images, many of which were child pornography. Huart admitted to possessing the phone and the

images. On October 13, FBI Special Agent Bryan Baker received the cell phone from the halfway house staff, and obtained a search warrant on December 8. Unfortunately, Huart's cell phone was passcode protected, and it eventually had to be sent to FBI Headquarters in Quantico, Virginia for analysis.[1] Agents did not unlock the phone and locate the images until February 14, 2012, and Special Agent Baker received the phone back on July 26, 2012. The warrant to search the cell phone specified that the search was to be conducted before December 15, 2011.

Prior to trial in the United States District Court for the Western District of Wisconsin, Huart filed two motions to suppress the contents of the cell phone, both of which were denied. The district court, adopting the findings of the magistrate judge, held that Huart did not have a reasonable expectation of privacy against searches of his cell phone at the halfway house, and furthermore that the search of his phone was conducted properly under the warrant once Special Agent Baker turned on the phone and attempted to access the data. The court held that the government's later efforts to crack the phone's passcode protection were conducted promptly and in compliance with the terms of the warrant. On February 13, 2013, Huart pleaded guilty to one count of possession of child pornography, but he reserved his right to appeal the denial of his suppression motions.

---

[1] The record does not disclose how the Rock Valley assistant director was able to search the phone from the outset, while Agent Baker could not. One likely explanation is that the passcode-protection mechanism on the phone had not been triggered by the time the assistant director found the images.

## II.      Discussion

When hearing an appeal of a district court's denial of a motion to suppress evidence, we review the court's legal conclusions de novo, and its factual findings for clear error. *United States v. Jackson*, 598 F.3d 340, 344 (7th Cir. 2010). Huart presents two arguments for suppressing the images found in his phone. First, he contends that he enjoyed a reasonable expectation of privacy in the device, and that its confiscation and the subsequent search of its contents unlawfully violated that privacy. Second, he argues that, because the FBI failed to break his passcode and examine the contents of the phone before the warrant's expiration date, the search was essentially warrantless. Because we hold that Huart lacked a reasonable expectation of privacy in the halfway house, any search of a phone he brought onto the premises did not require a warrant. Therefore we need not reach Huart's second contention.[2]

"Whether an expectation of privacy exists for Fourth Amendment purposes depends upon two questions: 1) whether the individual, by his conduct, has exhibited an actual expectation of privacy; and 2) whether the individual's expectation of privacy is one that society is prepared to recognize as reasonable." *United States v. Yang*, 478 F.3d 832, 835 (7th Cir. 2007). The inquiry is therefore both subjective, in that it requires the individual to manifest his own belief that

---

[2] We do note that, under Federal Rule of Criminal Procedure 41(e)(2)(B), a warrant for electronically stored information is executed when the information is seized or copied—here, when the Rock Valley staff seized the phone. Law enforcement is permitted to decode or otherwise analyze data on a seized device at a later time. Huart provides no reason to doubt that Rule 41(e)(2)(B) would defeat his contention, if reached.

he has privacy; and objective, in that this subjective expectation must conform to accepted societal expectations. It is well settled that prisoners have no reasonable expectation of privacy in the belongings they keep with them. *Hudson v. Palmer*, 468 U.S. 517, 526 (1984) ("Society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell"); *see also Peckham v. Wis. Dep't of Corr.*, 141 F.3d 694, 696 (7th Cir. 1998) (noting "*Hudson*'s abrogation of Fourth Amendment protections against unreasonable searches [of] prisoners' cells.")

Huart argues that, because a halfway house is a more lenient and less structured environment than a prison, this court should recognize a limited expectation of privacy for individuals serving their sentence there. Inmates living in Rock Valley are permitted to wear their own clothes and bring personal items into the facility, as long as they are inspected and are not prohibited under the house's regulations. Some inmates are able to obtain day passes and leave the facility unsupervised for certain approved purposes. Huart analogizes his stay at the halfway house to a term of probation. The Supreme Court has recognized that a search of a probationer's home, for example, is permissible when the search is designed to ensure compliance with the conditions placed on his freedom, or else is supported by reasonable suspicion of criminal activity; the Court has not endorsed general, suspicionless searches of probationers. *See United States v. Knights*, 534 U.S. 112, 121 (2001); *Griffin v. Wisconsin*, 483 U.S. 868, 874–76 (1987). Huart urges a similar approach to this case. He contends that we must balance society's diminished security interests in monitoring him against his partially restored liberty interests while he lives at the halfway house.

Although this court has not considered the appropriate level of privacy to be recognized for inmates of a halfway house, we have little difficulty concluding that Huart lacked both an objective and subjective expectation of privacy extending to either his phone or its contents. Upon arriving at the halfway house, Huart signed the "Conditions of Residential Community Programs" form, which explained that Huart was "in the custody of the U.S. Attorney General serving [a] sentence." By contract, Rock Valley was under the operational control of the BOP. His situation was therefore much more closely analogous to that of an inmate living in a prison, rather than a probationer. The Supreme Court has held that a suspicionless search of a parolee is reasonable under the Fourth Amendment because "'parole is an established variation on imprisonment of convicted criminals.'" *Samson v. California*, 547 U.S. 843, 850 (2006) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 477 (1972)). Likewise, Huart's stay at the halfway house was simply one particular way an inmate may serve a custodial sentence.

More specific to this case, Rock Valley's rules provided that, "[d]uring intake, all belongings will be searched and inventoried. Any new items brought into the facility or removed from the facility will be reported to staff so the inventory can be adjusted." Huart was not permitted to possess a cell phone at Rock Valley, and therefore any phone he brought into the facility was contraband subject to search and confiscation. In addition, the rules governing inmates who were allowed to have cell phones specified that "ANY STAFF may request at ANY TIME to view the contents of [an inmate's] cell phone with or without reason." These rules, which Huart implicitly agreed to obey, demonstrate both that he had surrendered any expectation of privacy in

the contents of his cell phone, and that society was not pre-pared to recognize any such expectation.

Huart's attempts to avoid this conclusion are unpersua-sive. He notes the Rock Valley rules permit the staff only to "request" to view the contents of a cell phone, and suggests that inmates are free to decline. This argument has two criti-cal flaws. First, Huart was never granted cell phone privileg-es, and therefore the staff was not constrained by this provi-sion. He was on notice that the phone was subject to search and confiscation once he brought it into the halfway house. But more importantly, the rule in question provides that "[r]efusal to ANY STAFF to surrender mobile device for random or suspect viewing upon request will result in deni-al of cell phone privileges." An inmate at Rock Valley is therefore not free to reject a search of his cell phone. The negative consequences of a refusal may be less severe than they would be in a prison, but they are nevertheless de-signed to compel compliance. Inmates with phone privileges are essentially faced with the choice to permit suspicionless searches of their phone, or else not have a phone at all. In no instance, therefore, do they enjoy the private use of a cell phone.

Finally, Huart argues that the government's seizure of his cell phone violated his privacy because it was a trespass. *See United States v. Jones*, 132 S. Ct. 945 (2012). But the phone was contraband brought into a BOP-contracted facility. It was not a trespass for the Rock Valley Staff to seize contraband on the halfway house's grounds. Moreover, even if *Jones* ap-plied to this case, it would establish only that a search within the meaning of the Fourth Amendment occurred, not that it was unreasonable.

Because Huart lacked a reasonable expectation of privacy in his cell phone or its contents while living at the Rock Valley halfway house, the search that uncovered the phone and the images stored on it does not implicate the Fourth Amendment. *See United States v. Jacobsen*, 466 U.S. 109, 113 (1984). We therefore do not reach the questions of whether he consented to a search, or whether it was adequately supported by reasonable suspicion.

### III.    Conclusion

For the foregoing reasons, we AFFIRM the district court's denial of Huart's motions to suppress.