Opinion by CHIEF JUDGE LOEB
¶ 1 Defendant, Justin Triplett, appeals his judgment of conviction for possession of a controlled substance. The sole issue on appeal is whether the trial court erred in denying Triplett's motion to suppress evidence. At the time the charged offense was committed, Triplett was an offender residing in the Mesa County residential community corrections facility. He contends on appeal that a vial of drugs was found in his clothing as the result of an unconstitutional search and that statements he made to law enforcement after being confronted with the illegally obtained evidence should have been suppressed as "fruit of the poisonous tree" and as involuntary.
¶ 2 To address Triplett's arguments, we must determine, as a matter of first impression in Colorado, whether his status as a residential community corrections offender entitled him to a greater expectation of privacy than that of traditional, incarcerated offenders. Under the circumstances here, we conclude that it did not and that, therefore, the search of his clothing was legal and his subsequent statements to law enforcement officials were not tainted nor were they involuntary. Thus, we affirm.
I. Background and Procedural History
¶ 3 All of the facts below are taken from the transcript of the suppression hearing, the trial court's findings of fact, and defendant's motion to suppress. Moody v. People , 159 P.3d 611, 617 (Colo.2007) (when reviewing a trial court's suppression ruling, an appellate court must only consider evidence presented at the suppression hearing); see also People v. Gomez-Garcia , 224 P.3d 1019, 1022 (Colo.App.2009).
¶ 4 At the time of the alleged offenses, Triplett was serving the remainder of a Colorado Department of Corrections (DOC) sentence *1058 [1] at a residential community corrections facility. As a "client" at this facility, he was able to obtain passes to leave the premises for work and other approved activities. However, he lived at the facility and was required to remain on the premises if he did not have a valid pass and to return each time his pass expired.
¶ 5 While Triplett was showering in the bathroom located off of the facility's community room, a community justice officer,[2] Daniel Wells, entered the bathroom to conduct a routine cleanliness inspection. When Wells saw Triplett's clothing hanging next to the shower, he decided to conduct a random unscheduled search of the clothing. Wells found a vial of off-white powder in Triplett's sock, which was in the pocket of his pants. Triplett's inmate identification card was in the other pants pocket.
¶ 6 Upon finding the vial, Wells consulted with Triplett's case manager, who advised Wells to bring Triplett to a problem solving technique (PST) room after his shower. In a conversation with three community corrections personnel,[3] Triplett stated that he bought what he believed to be Adderall from a coworker, that he had taken Adderall in pill form while in the facility, and that he had crushed the remaining pills into a powder.
¶ 7 The case manager asked Triplett if he wanted to write a statement, and Triplett responded that he did. Triplett made a written statement of the incident on a template routinely provided to community corrections clients.
¶ 8 Triplett was left alone in the room with a clipboard to write his statement. The door was shut and Triplett knew that he could not open it from the inside. While he was writing his statement, a police officer, Chris Kopp, arrived at the facility. Kopp was dispatched on a request to test an unknown substance, but upon arriving, he realized that the facility's officials wished to proceed with charges against Triplett.
¶ 9 Kopp waited until Triplett had finished writing his statement before entering the PST room. When he entered the PST room, he advised Triplett of his rights under Miranda v. Arizona , 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and asked Triplett if he wanted to talk about what had happened. Triplett paused briefly and then began telling the officer what had happened, namely that he had purchased Adderall from a coworker and had taken the pills twice and then crushed the remaining pills into a powder.
¶ 10 The powder was tested at a lab and was identified as methylphenidate, a schedule II controlled substance. The prosecution charged Triplett with introducing contraband in the first degree and possession of a controlled substance-schedule II-four grams or less.
¶ 11 Prior to trial, Triplett moved to suppress the vial of powder, arguing that it had been obtained in violation of his Fourth Amendment rights because the search was not based on a warrant or any individualized or reasonable suspicion. Triplett also moved to suppress his statements to community corrections personnel and Kopp. The trial court held a suppression hearing and issued a written order denying Triplett's motion.
¶ 12 At a bench trial, the prosecution proffered and the court admitted into evidence the vial of powder, the lab results on the powder, and Triplett's statements to Kopp. The court acquitted Triplett of introducing contraband, but it found him guilty of possession of a controlled substance. The court sentenced Triplett to two years of unsupervised probation. This appeal followed.
II. Suppression Hearing and Order
¶ 13 Because we are limited to the facts and evidence presented at the hearing and the court's application of the law to those facts, we set out the details of the motion, *1059 hearing, and court order below. Moody , 159 P.3d at 617 ; Gomez-Garcia , 224 P.3d at 1022.
A. Triplett's Motion
¶ 14 In his motion, Triplett argued that he had a greater expectation of privacy than an incarcerated inmate because of his status as a community corrections offender. Thus, he argued, the search was required to be based, at the very least, on a warrant or individualized or reasonable suspicion of wrongdoing in order to comply with the Fourth Amendment's prohibition against unreasonable searches. He also asserted that his statements to the community corrections personnel and Kopp should be suppressed as fruit of the poisonous tree or, in the alternative, as involuntary statements in violation of the Fifth Amendment.
B. The Suppression Hearing
¶ 15 The evidence showed that Triplett was referred to the Mesa County community corrections program by the DOC. At the time of the hearing and during his stay in community corrections, Triplett was an "inmate" searchable on the DOC inmate database. Moreover, a manager of the Mesa County Criminal Justice Department (the manager) testified on cross-examination that Triplett was considered an inmate within the DOC while residing at the facility.
¶ 16 The community corrections facility where Triplett lived was referred to as a "detention facility." As an offender in a residential program, Triplett could request passes to leave the facility for work and other authorized activities, but if he left without a pass or failed to return before the pass expired, he was subject to escape charges; Triplett could not lawfully leave the facility whenever he chose. On the day of the search and interrogations, Triplett did not have a pass and was not free to lawfully leave the facility.
¶ 17 Wells testified that cleanliness inspections are a normal part of his job and that he inspects certain areas of the facility, including bathrooms, five times per day. He further clarified that clients are subject to random searches three times per week when they return to the facility and must undergo urinalysis tests every month. Clients are also subject to searches before entering a PST room. Moreover, he said an officer such as himself could conduct unscheduled searches as often as necessary.
¶ 18 Wells admitted that the search of Triplett's clothing was a random unscheduled search and that he had no reason to suspect Triplett of wrongdoing. He further testified that he decided to conduct the random search because of advice given to him by another corrections officer regarding the best time and place to search for contraband.
¶ 19 The manager testified that when Triplett was admitted to the facility, he underwent a standard intake process. Intake included inventorying his property, signing intake paperwork, an orientation on the program, and filling out personal health information. As part of the intake process, Triplett was given a client handbook that contained all of the rules and expectations of the program. The handbook specifically advised clients that they could be searched for contraband at any point for any reason. The manager further testified that clients are given a test to demonstrate their understanding of the rules. While looking at Triplett's community corrections file, the manager testified that Triplett had taken and passed the test on the client handbook. Specifically, Triplett missed only two of the "fifty some" questions and answered the question about contraband searches correctly.[4]
¶ 20 According to Wells, the questioning by the community corrections personnel was "cordial" and not aggressive. The PST room *1060 was approximately eight feet by ten feet and had windows. The room contained a single chair and no table. The personnel stood in the door frame or just outside the room in the hall to speak with Triplett-the door was open during that interrogation.
¶ 21 The entire incident, including both interrogations and the time Triplett took to write his statement, lasted one hour. Defense counsel did not make any argument or proffer any evidence that there was any form of physical or emotional coercion (promises, bribery, etc.) involved in either the interrogation by the facility's personnel or by Kopp.
¶ 22 The prosecutor argued that the search was proper because, as an inmate, Triplett did not have a reasonable expectation of privacy in his clothing while at the detention facility. However, the prosecutor conceded that the statements made to the community corrections personnel without Miranda warnings should be suppressed. But he asserted that the written statement and the statements to Kopp were voluntary and admissible.
¶ 23 Defense counsel argued that Triplett was entitled to a greater expectation of privacy as a community corrections offender because he had more freedom than a traditional DOC inmate. It followed, he argued, that the prosecution was required to prove that Wells had an individualized or reasonable suspicion of wrongdoing or that there was an exception to the warrant requirement, but that the prosecution had failed to show either. Moreover, because the search was unconstitutional under the Fourth Amendment, counsel further argued that Triplett's statements to Kopp were also inadmissible because they were based on the illegal search and were also involuntary.[5]
C. Trial Court's Order
¶ 24 The court's written order denied Triplett's motion to suppress the drugs, the written statement, and the oral statements to Kopp. The court did not analyze the oral statements to the community corrections personnel because the prosecution had conceded that issue.
¶ 25 Regarding the search of Triplett's clothing, the court concluded that Triplett did not have a reasonable expectation of privacy that society was willing to recognize because his status was more analogous to that of an inmate in the DOC with a nearly nonexistent expectation of privacy than that of an offender on probation or parole who has diminished expectations of privacy, but more of an expectation of privacy than a DOC inmate. In so ruling, the court analogized this case to the supreme court's opinion in People v. McCullough , 6 P.3d 774 (Colo.2000), which held that a warrantless, unannounced search of a parolee's home did not violate the Fourth Amendment. The court's order specifically concluded that "Colorado society would agree that a parolee living at home has a reasonable expectation of greater privacy than a community corrections resident." The court also found that the search was done at a reasonable hour, was reasonable because it was not prolonged, and was not harassing.
¶ 26 As to the voluntariness of Triplett's statements to Kopp, the court concluded the test in Oregon v. Elstad , 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), was applicable. Although noting that there was little evidence presented on the voluntariness test by either party, the court nevertheless proceeded to make findings based on the record before it. The court found that "there is no evidence at all of coercive police conduct, which is a predicate to finding involuntariness." Ultimately, the court concluded that the prosecution had proven by a preponderance of the evidence that Triplett's statements to Kopp were voluntary.
III. Analysis
¶ 27 On appeal, Triplett contends that the trial court erred in denying his motion to suppress the drugs found in his clothing and his statements to Kopp.[6] Specifically, he asserts that the drugs were found through an *1061 illegal search by Wells because the search was conducted without a warrant and was not supported by reasonable or individualized suspicion. He further asserts that his statements to Kopp should have been suppressed both because they were fruit of the illegal search and because they were not voluntary under the totality of the circumstances. We address and reject each contention in turn.
A. Standard of Review
¶ 28 We review a trial court's suppression order with deference to the trial court's findings of historical fact and will not overturn them if they are supported by competent evidence in the record. People v. Revoal , 2012 CO 8, ¶ 9, 269 P.3d 1238. We are mindful that it is the function of the trial court, and not the reviewing court, to weigh the evidence and determine the credibility of witnesses. People v. Brazzel , 18 P.3d 1285, 1288 (Colo.2001). However, whether the trial court applied the correct legal standards to the facts is a question of law that we review de novo. Revoal , ¶ 9. We examine the trial court's legal conclusions under the totality of the circumstances. People v. Ackerman , 2015 CO 27, ¶ 10, 346 P.3d 61. Thus, review of a suppression order is a mixed question of law and fact. Id.
¶ 29 To the extent we must interpret Colorado's community corrections statutes in order to address Triplett's Fourth Amendment argument, we consider matters of statutory interpretation de novo. People v. Yoder , 2016 COA 50, ¶ 12, 2016 WL 1385279. If statutory language is clear, we apply its plain and ordinary meaning. Id.
B. Fourth Amendment-Search of the Clothing
¶ 30 Triplett's primary argument on appeal is that Wells' search of Triplett's clothing violated the Fourth Amendment because Triplett had a greater reasonable expectation of privacy than a DOC inmate and, therefore, Wells was required to have individualized suspicion or a warrant before conducting the search. We disagree.
1. Applicable Law
a. Fourth Amendment Law
¶ 31 The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." "[W]hether or not a search is 'unreasonable' under the Fourth Amendment 'depends on all of the circumstances surrounding the search or seizure and the nature of the search itself.' " McCullough , 6 P.3d at 779 (quoting United States v. Montoya de Hernandez , 473 U.S. 531, 537, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985) ). "Thus, the 'permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.' " Id. (quoting Skinner v. Ry. Labor Execs.' Ass'n , 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) ).
¶ 32 Although "[s]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment," People v. Holmes , 981 P.2d 168, 170 (Colo.1999) (quoting Katz v. United States , 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) ), the Supreme Court has "recognized exceptions to [these] requirements when 'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.' " McCullough , 6 P.3d at 779 (quoting Skinner , 489 U.S. at 619, 109 S.Ct. 1402 ). The Court has, in the past, applied this "special needs" balancing concept to probation systems and operating a school or prison. Id. Colorado courts have applied this concept to probation and parole programs, as well as to corrections facilities. Id. (parole system); People v. Salaz , 953 P.2d 1275, 1277 (Colo.1998) (corrections facilities); People v. Samuels , 228 P.3d 229, 236-37 (Colo.App.2009) (probation system).
¶ 33 A search prohibited under the Fourth Amendment occurs when the government intrudes on an area where a person has a "constitutionally protected reasonable expectation of privacy."
*1062 Henderson v. People , 879 P.2d 383, 387 (Colo.1994) (quoting Katz , 389 U.S. at 360, 88 S.Ct. 507 (Harlan, J., concurring)). In other words, the Fourth Amendment provides protection only in contexts where the citizen has a reasonable expectation of privacy in the place or things searched. Salaz , 953 P.2d at 1277. "Whether an individual's expectation of privacy is reasonable depends on two factors. '[F]irst, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable?' " Holmes , 981 P.2d at 171 (alteration in original) (quoting California v. Ciraolo , 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986) ). Whether society is willing to recognize the expectation as reasonable turns on "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." Ciraolo , 476 U.S. at 212, 106 S.Ct. 1809 (quoting Oliver v. United States , 466 U.S. 170, 182-83, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984) ).
¶ 34 Incarcerated persons have a nearly nonexistent reasonable expectation of privacy. E.g. , Salaz , 953 P.2d at 1277. Some courts have conceptualized the expectation of privacy accorded to offenders moving through the criminal justice system as a "privacy continuum":
• the privacy interest of prisoners in custody is nearly extinguished by the judgments placing them in custody;
• persons on conditional release, such as probation, parole, and supervised release, have acquired additional liberty, but they remain subject to substantial controls;
• felons whose terms of incarceration have expired have a basis for legal obligations that are different from those of the general population because of their established criminality;
• and those who have never been convicted of a felony have the highest privacy expectation because "[w]hat is 'reasonable' under the [F]ourth [A]mendment for a person on conditional release, or a felon, may be unreasonable for the general population."
Banks v. United States , 490 F.3d 1178, 1186-87 (10th Cir.2007) (citing Green v. Berge , 354 F.3d 675, 679-81 (7th Cir.2004) (Easterbrook, J., concurring)) (discussing the continuum in the context of DNA-indexing statutes).
¶ 35 Importantly, "[i]n the absence of a reasonable expectation of privacy, law enforcement officials are free to conduct a warrantless search notwithstanding whether the search is also justified by exigent circumstances or some other exception to the warrant requirement of the Fourth Amendment." People v. Lee , 93 P.3d 544, 547 (Colo.App.2003). In the incarceration context, "[s]earches conducted by officials entrusted with the orderly operation of the ... [correctional institutions] of this state are not unreasonable so long as they are not conducted for the purpose of harassing or humiliating the inmate or in a cruel or unusual manner." Salaz , 953 P.2d at 1277 (alterations in original) (quoting Moore v. People , 171 Colo. 338, 342, 467 P.2d 50, 52 (1970) ).
¶ 36 As relevant here, "[t]he validity of a search of an inmate's clothing in a jail or other correctional facility can be upheld without regard to whether the inmate subjected to the search has been convicted or is in custody for some other reason." Id. at 1277. The lower expectation of privacy
accorded to an inmate's clothing stems from the fact that correctional facilities are "fraught with security dangers." The need for preservation of internal order and discipline ... -not to mention the specific and direct threats to security posed by the availability of drugs or weapons-weigh heavily against recognition of any expectation of privacy[.]
Id. at 1278 (citations omitted) (quoting Bell v. Wolfish , 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) ).
b. Law on Colorado's Community Corrections System
¶ 37 Triplett does not dispute that inmates have little expectation of privacy. Instead, he asserts that, as a client of the community corrections program, he had more freedoms and, thus, had a greater expectation of privacy than those inmates in traditional incarceration facilities. Thus, we first consider what a sentence to a residential community corrections *1063 program means under the pertinent Colorado statutes and case law.
¶ 38 An offender can be placed in the community corrections program in three ways: (1) a direct sentence from a trial court; (2) a transfer by referral from the DOC subject to statutory eligibility (referred to as a transitional offender); or (3) as a condition of probation. Benz v. People , 5 P.3d 311, 314 (Colo.2000). Here, we are concerned with the second avenue-Triplett was transferred to the community corrections program by the DOC and is a "transitional offender."
¶ 39 The referring agency is the agency that maintains legal jurisdiction over an offender referred to or placed in a community corrections program. § 17-27-102(7), C.R.S. 2015. For a transitional offender such as Triplett, that agency is the DOC. Benz , 5 P.3d at 314.[7] Thus, when Wells searched Triplett's clothes, Triplett was statutorily subject to the jurisdiction of the DOC.
¶ 40 Community corrections programs are intended for lower-risk offenders. Specifically, the programs are designed to provide sentencing courts with the option of imposing a sentence that is more severe than probation, but not as harsh as incarceration. Id. ; see § 17-27-101, C.R.S. 2015. "Community corrections programs therefore may incorporate both residential and non-residential options, depending upon the type of offender and the purposes and scope of the treatment." Benz , 5 P.3d at 314. Here, notably, we are concerned with a residential community corrections program because Triplett was living at, and was required to return to, the community corrections detention facility operated by Mesa County Criminal Justice Services.
¶ 41 Community corrections sentences are a form of imprisonment in Colorado. See Beecroft v. People , 874 P.2d 1041, 1045 (Colo.1994) ("When an offender is sentenced to community corrections as a resident, the sentence is a term of imprisonment, but one served in a local facility rather than in a DOC facility."); People v. Saucedo , 796 P.2d 11, 12 (Colo.App.1990). Moreover, as a community corrections offender, Triplett was considered "in custody" for purposes of Colorado's escape statute. §§ 17-27-106, 18-8-208, C.R.S. 2015. In other words, if Triplett had left his detention facility without proper authorization or failed to return within the prescribed timeframe, he would have been subject to the charge of escape from custody. Saucedo , 796 P.2d at 12 ; see also People v. Forester , 1 P.3d 758, 759 (Colo.App.2000) (stating that even unauthorized absence from non-residential community corrections placement constitutes escape under sections 17-27-106 and 18-8-208 ).
2. Application
¶ 42 For the reasons explained below, we conclude that Triplett had no reasonable expectation of privacy in his clothing while in the confines of his residential community corrections detention facility. Contrary to Triplett's arguments, his status as a resident in community corrections is, in our view, more analogous to that of an incarcerated DOC inmate than that of an offender on probation or parole.
¶ 43 The first question we must consider in our Fourth Amendment analysis is whether Triplett had a reasonable expectation of privacy in his clothing that was hanging by the shower in the detention facility. The first prong of that question is whether Triplett subjectively believed he had an expectation of privacy in his clothing. While the transcript contains no direct evidence of Triplett's subjective expectation of privacy, we infer from his arguments in the trial court that, because he was given more freedom of movement while at the community corrections facility and was allowed to wear civilian clothes, he believed he had more privacy in his belongings and person than an inmate in the DOC. We also note that Triplett's act of hiding the vial of drugs in his sock creates an inference that he had a subjective belief that his clothing was a private place to conceal contraband. See Ciraolo , 476 U.S. at 211-12, 106 S.Ct. 1809 (stating that creating a ten-foot fence concealing marijuana crop can be inferred as a subjective expectation of privacy even though it was an incomplete attempt to conceal).
*1064 ¶ 44 The second prong of the expectation of privacy analysis is whether society is willing to recognize Triplett's subjective belief that he had a greater expectation of privacy than his DOC counterparts.
¶ 45 Based on the evidence adduced at the suppression hearing, and considering the totality of the circumstances, we conclude that Triplett could not reasonably have had a subjective belief that he had an expectation of privacy in his clothing while in the facility and that, in any event, society is not willing to recognize any such subjective belief. Triplett, therefore, had no reasonable expectation of privacy in his clothing at the detention facility. The following evidence and considerations support our conclusion:
• Testimony established that Triplett was required to live in and return to the community corrections facility. He could leave legally only with prior approval and was subject to escape from custody charges if his absence was not approved. See §§ 17-27-106, 18-8-208.
• Triplett was informed that he was subject to random unannounced searches, and he was aware of that requirement as indicated by testimony regarding the client handbook and Triplett's test on the same. His clothing was, therefore, not free from inspection.
• Wells testified that offenders at the detention facility were subject to random searches when they re-entered the facility three times per week, searches each time they entered a PST room, and monthly urinalysis tests. He also testified that officers in the facilities could conduct "unscheduled searches more often as necessary or as decided by anybody." The reality and possibility of these searches further reduced Triplett's subjective and objective expectation of privacy.
• Triplett was searchable on the DOC inmate database and, as confirmed by the facility manager, Triplett was still considered an inmate within the DOC.
• As a transitional offender, Triplett was transferred by the DOC to a community corrections facility to serve out the remainder of his sentence before becoming eligible for parole. Triplett was not "released" from the jurisdiction of the DOC or incarceration.
• Because Triplett was referred to community corrections by the DOC, the DOC was the referring agency and Triplett was therefore subject to its jurisdiction. § 17-27-102(7) ; Benz , 5 P.3d at 314.
• Under section 18-1.3-301(2)(b)(III), C.R.S. 2015, the DOC transfers an offender to a community corrections program prior to the offender's parole eligibility date. Thus, by the plain language of this statute, Triplett was not yet eligible for parole and was still serving his DOC sentence.
• Colorado case law is clear that a sentence to community corrections is more severe than a sentence to probation. See, e.g. , Benz , 5 P.3d at 314. Thus, in our view, the reasonable expectation of privacy for a community corrections offender should be less than that of a probationer. And, pursuant to this case law, Triplett's expectation of privacy cannot be the same as that of a probationer because he is serving a more severe (i.e., restrictive) sentence.
• Our supreme court has held that parolees (i.e., those released from DOC sentences) have a "minimal" expectation of privacy in their homes. McCullough , 6 P.3d at 781. In our view, an offender living at a residential detention facility has an even lesser expectation of privacy than a parolee who has been released from the DOC and is living in his own home with fewer restrictions on his freedom to come and go.
• Triplett's clothing was searched inside the detention facility. As noted in Salaz , searches of clothing of offenders in a corrections facility serve an important state interest of preserving order and discipline within the facility and protecting against the security dangers posed by drugs and weapons. 953 P.2d at 1278.
¶ 46 These circumstances persuade us that Triplett's presence at a residential community corrections facility is more analogous to that of an inmate incarcerated in a DOC
*1065 facility as opposed to that of a probationer or parolee and he, therefore, has a nearly nonexistent expectation of privacy in searches of his property and person.
¶ 47 Although no Colorado appellate case has considered this issue in the context of an offender living in a residential community corrections facility, at least two federal courts have considered an offender's reasonable expectation of privacy while living in a halfway house, a form of community-based corrections. In United States v. Huart , 735 F.3d 972, 975 (7th Cir.2013), the Seventh Circuit considered facts very similar to those at issue here. There, an offender serving a sentence in a halfway house asserted that the search of his cell phone was illegal "because a halfway house is a more lenient and less structured environment than a prison" and, therefore, the court should recognize a limited expectation of privacy for individuals serving their sentences there. Id. Like Triplett here, the court noted that offenders serving time in a halfway house were permitted to wear their own clothes and were granted day passes to leave the facility for certain purposes. Id. However, the court found it compelling that Huart signed a document acknowledging that he was in custody serving a sentence and that the rules of the halfway house specifically stated that his cell phone, if he was permitted to have one, was subject to search at any time. Id. at 975-76.
¶ 48 The court ultimately concluded that Huart had no subjective or objective expectation of privacy in his cell phone or its contents. Id. at 975. More specifically, the court noted that Huart had implicitly agreed to the rules regarding cell phones, which further demonstrated that he had surrendered any expectation of privacy in the phone's contents and that society was not prepared to recognize any such expectation. Id. at 976.
¶ 49 Similarly, in United States v. Dixon , 546 F.Supp.2d 1198, 1203 (D.Kan.2008), the court ruled that a halfway house is an established variation on imprisonment and is a community-based residential facility for offenders. The court noted that Dixon remained in the physical and legal custody of the Federal Bureau of Prisons at the time of the search of his belongings. Id. Evidence at the suppression hearing showed that Dixon had signed a form acknowledging that he was subject to random searches of his person and property at any time, with or without cause. Id. Given these facts and the "overwhelming" state interest of supervising residents in custody at halfway houses in order to reduce recidivism and better prepare offenders for re-entry into society, the court found that Dixon "did not have an expectation of privacy in his ... possessions that society would recognize as legitimate." Id.
¶ 50 We are persuaded by the reasoning in Huart and Dixon and find those cases helpful to our analysis here. Similar to the offenders in both Huart and Dixon , Triplett was serving the remainder of a sentence in a residential community corrections placement; he was in custody and under the jurisdiction of the DOC; and he acknowledged, pursuant to the rules of the facility, that he was subject to random searches. Also, like in Huart , he was allowed to wear his own clothes and required to obtain permission to leave the facility for certain purposes. In addition, Triplett was subject to random re-entry searches and monthly urinalysis tests, which further reduced any subjective belief he might have had in an expectation of privacy in his clothing or person.
¶ 51 Furthermore, the state's interests in supervising offenders in a residential community corrections facility and maintaining the safety in such facilities are substantial; they create a special need outside of normal law enforcement purposes to justify an exception to the requirement for reasonable suspicion and a warrant.[8]
*1066 Dixon , 546 F.Supp.2d at 1203 ; McCullough , 6 P.3d at 779 ; see also Salaz , 953 P.2d at 1277 (noting state interests in corrections facilities); Samuels , 228 P.3d at 236-37 (same in the probation system).
¶ 52 Thus, we conclude, similar to the courts in Dixon and Huart , that Triplett had no reasonable expectation of privacy in his belongings at the residential community corrections facility.
¶ 53 Having concluded that the prosecution did not need to show an individualized or reasonable suspicion for the search, we must also consider whether the search was reasonable under the circumstances. Salaz , 953 P.2d at 1277. The trial court found that the search here was not "done at an unreasonable hour, unduly prolonged, frequent, repeated, or otherwise arbitrary, capricious or harassing." The record supports these findings, and we discern nothing in the record to indicate that the search was humiliating or was conducted in a cruel or unusual manner. Id. Therefore, we conclude the search was reasonable under the Fourth Amendment and was legal and valid. Accordingly, the trial court did not err in denying Triplett's motion to suppress the vial of drugs.
C. Fruit of the Poisonous Tree-Statements to Kopp
¶ 54 Triplett contends that because the search of his clothing violated his rights under the Fourth Amendment, any statements he made to Kopp were tainted by the illegal search and were, therefore, inadmissible as "fruit of the poisonous tree." We disagree.
¶ 55 The "fruit of the poisonous tree" doctrine provides that evidence derived from or acquired by the police through unlawful means, such as an illegal search, is inadmissible in criminal prosecutions. Wong Sun v. United States , 371 U.S. 471, 484-86, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) ; People v. Schrader , 898 P.2d 33, 37 (Colo.1995). It is axiomatic that for the doctrine to apply, the search or entry on which the later evidence was based must have been illegal. See, e.g. , Schrader , 898 P.2d at 37 (holding that because the search of the defendant's property was legal, the later statements to a detective based on that search were not inadmissible under the fruit of the poisonous tree doctrine).
¶ 56 Because we conclude that the search of Triplett's clothing hanging in the facility's bathroom was not illegal under the Fourth Amendment, the fruit of the poisonous tree doctrine is not applicable here, and we reject Triplett's argument based on that doctrine.
D. Fifth Amendment-Voluntariness of Statements to Kopp
¶ 57 Alternatively, Triplett contends that his statements to Kopp should have been suppressed because he made them after he spoke to community corrections officials without the benefit of Miranda warnings and after he was confronted with the vial of drugs that was found as the result of an illegal search. He asserts that these actions by law enforcement rendered his later statements to Kopp involuntary under the totality of the circumstances. We disagree.
1. Applicable Law
¶ 58 Under both the United States and Colorado Constitutions, a criminal defendant has a right to be free from compelled self-incrimination. U.S. Const. amend. V ; Colo. Const. art. II, § 18. Accordingly, a suspect's statements resulting from custodial police interrogation are generally inadmissible in the prosecution's casein-chief unless the defendant is advised of and waives his or her right to remain silent. Miranda , 384 U.S. at 444, 86 S.Ct. 1602 ; People v. Madrid , 179 P.3d 1010, 1014 (Colo.2008).
¶ 59 When a defendant challenges the voluntariness of a statement, the prosecution must establish by a preponderance of the evidence that the defendant made the statement voluntarily. E.g. , People v. Valdez , 969 P.2d 208, 210 (Colo.1998). "In determining whether a defendant's statements are voluntary, a trial court must consider the totality of the circumstances surrounding the statements." Id. at 211. Colorado courts have articulated a non-exhaustive list of factors to consider in such an analysis. People v. Al-Yousif , 206 P.3d 824, 834 (Colo.App.2006) (citing People v. Gennings , 808 P.2d 839, 844 (Colo.1991) ).
*1067 ¶ 60 However, critical to any finding of involuntariness is the existence of coercive governmental conduct, either physical or mental, that plays a significant role in inducing a confession or an inculpatory statement. Valdez , 969 P.2d at 211. Indeed, coercive conduct is a necessary predicate to a finding of involuntariness. People v. Wood , 135 P.3d 744, 749 (Colo.2006).
¶ 61 Where a defendant has made custodial statements without proper Miranda warnings but makes subsequent custodial statements after waiving his or her rights under Miranda , the later advised statements may be involuntary. People v. Verigan , 2015 COA 132, ¶ 37, 2015 WL 5606307. However, if the pre-advisement statements are voluntary (i.e., have none of the earmarks of coercion), Miranda warnings given prior to a later statement will ordinarily render the later statement admissible (assuming that the later statement also was made free of coercion). Id. (citing Elstad , 470 U.S. at 318, 105 S.Ct. 1285 ). In Elstad , the Supreme Court concluded that a suspect who has given a voluntary but unwarned statement, absent deliberately coercive or improper tactics in obtaining that statement, is not entitled to suppression of the subsequent, warned statements. Id.
2. Application
¶ 62 Triplett contends that because his prior statements to community corrections personnel, both verbal and written, were made without the benefit of Miranda warnings, and because he was confronted with the fruits of an illegal search, his statements to Kopp were involuntary. Triplett made no attempt either in the district court or on appeal to relate the conditions of his interrogations to the voluntariness factors set forth in Colorado case law. We understand his argument on appeal to be simply that the interrogation by Kopp was coercive because it was conducted in a relatively small (eight-by-ten foot), locked room and because he was confronted with illegally obtained evidence to induce his statements.
¶ 63 In its analysis of Triplett's statements to Kopp, the trial court relied on Elstad and stated that there was no reason to depart from the reasoning in that case. The court then stated that the only remaining question was whether Triplett's statements to Kopp were voluntary. The court therefore implicitly found that the unwarned statements made to Wells and the other community corrections personnel were made without coercion and were voluntary-otherwise, under Elstad , Triplett's later statements to Kopp would be rendered involuntary and inadmissible.
¶ 64 We conclude that the following facts elicited at the suppression hearing support the trial court's finding that Triplett's statements to community corrections personnel were voluntary:
• The "interrogation" by Wells lasted at most five minutes.
• At most, Triplett was in the PST room for one hour, which included when the door was open and he was speaking with the community corrections personnel; the time when Triplett was alone in the room writing his statement; and the time Triplett spoke with Kopp.
• There was no evidence of promises or physical or emotional coercion.
• Triplett was asked if he wanted to write a statement, and he volunteered to do so. He was left alone to complete his statement without interference of any kind-Kopp did not enter the room until Triplett had completed his written statement.
¶ 65 In determining the voluntariness of Triplett's statements to Kopp, the court noted that Triplett did not make any arguments based on any of the specific factors articulated in the applicable Colorado case law. Nevertheless, the court made findings of fact on each of those factors. It concluded that the prosecution had proven by a preponderance of the evidence that Triplett's statements to Kopp were voluntary. In particular, the court noted that there was no evidence in the record of coercive police conduct, which is a predicate to a finding of involuntariness.
¶ 66 The court's findings are supported by the record, and we perceive no evidence of coercive tactics used either by the community corrections personnel or Kopp. Only if the unwarned statements made to the community corrections personnel were coercive (i.e., *1068 involuntary) in some way would Triplett's later warned statements to Kopp be inadmissible. Verigan , ¶ 31. We conclude they were not.
¶ 67 Further, as we have concluded above, the search of Triplett's clothing did not violate his Fourth Amendment rights, and, therefore, that search can have no bearing on the Fifth Amendment question of whether Triplett's statements to Kopp were voluntary. The mere fact that Triplett spoke to personnel at his residential facility without the benefit of Miranda warnings is not, in and of itself, enough to render his later statements, which were made with the benefit of a Miranda advisement, involuntary. Id. at ¶¶ 31, 37.
¶ 68 In sum, we conclude that Triplett's statements to Kopp were voluntary and admissible.
IV. Conclusion
¶ 69 The judgment is affirmed.
JUDGE STERNBERG* and JUDGE CASEBOLT* concur.

The record does not indicate on what charges Triplett was originally convicted and sentenced to the custody of the DOC. However, this information is irrelevant to the current appeal.

In his testimony, Wells stated that he was a community justice officer employed by the Mesa County Criminal Justice Services Department. Wells was not a sworn law enforcement officer and was not employed by DOC.

Wells, Triplett's case worker, and another community justice officer were present.

Defense counsel objected to this testimony based on a discovery violation. Apparently, the prosecution had just come into possession of the file immediately before the hearing and had not yet disclosed it to defense counsel. The trial court ruled that the manager could testify and that if, after reviewing the relevant portions of Triplett's community corrections file, counsel wanted the court to hold a second hearing for further cross-examination of the manager, the court would do so. The court gave counsel thirty days to review the file and schedule a second hearing. The record does not reflect that defense counsel ever sought to, or did in fact, further cross-examine the manager.

On appeal, Triplett does not challenge the validity or completeness of the Miranda warnings Kopp recited to him, nor does he assert that his implied waiver of these rights was invalid.

Triplett's written statement was not introduced into evidence at trial and, thus, is not at issue on appeal.

Similarly, the trial court is the referring agency for direct placement offenders, and the probation department is the referring agency for probationers participating in community corrections. See Benz v. People , 5 P.3d 311, 314 (Colo.2000).

We reject Triplett's argument that the trial court erred in "applying" the three-factor test announced in People v. McCullough , 6 P.3d 774 (Colo.2000). McCullough considered the reasonable expectation of privacy a parolee had in his home. The supreme court was unwilling to articulate a blanket rule that a parolee has no reasonable expectation of privacy. Instead, the court announced three requirements when considering whether the search of a parolee's property is legal under the Fourth Amendment, explicitly holding that individualized suspicion is not required. Id. at 781. The trial court here appropriately acknowledged the holding in McCullough and analogized to the facts here because Colorado courts had not previously considered the issue of the reasonable expectation of privacy of an offender in a residential community corrections facility.

Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5 (3), and § 24-51-1105, C.R.S. 2015.