2015 CO 27

**The PEOPLE of the State of Colorado,**
**Plaintiff–Appellant**

v.

**Travis Brandt ACKERMAN,**
**Defendant–Appellee**

**Supreme Court Case No. 14SA358**

Supreme Court of Colorado.

April 20, 2015

Clifford E. Riedel, District Attorney, Eighth Judicial District, David P. Vandenberg, Deputy District Attorney, Lindsay Reilly, Deputy District Attorney, Dawn Downs, Deputy District Attorney, Fort Collins, Colorado, Attorneys for Plaintiff–Appellant

Eric G. Fischer, P.C., Eric G. Fischer, Fort Collins, Colorado, Attorneys for Defendant–Appellee

JUSTICE BOATRIGHT delivered the Opinion of the Court.

¶ 1 In this interlocutory appeal pursuant to C.A.R. 4.1, the People seek review of the trial court's order suppressing the results of a

blood draw taken from the Defendant–Appellee, Travis Brandt Ackerman. At the suppression hearing, the trial court found that a warrant was required before the police could order a blood draw and that the police lacked exigent circumstances that would justify the involuntary, warrantless blood draw under the Fourth Amendment. The People appealed on the sole issue of whether the facts of this case constituted exigent circumstances. We hold that exigent circumstances existed where the police were still investigating the scene of the crime and were not finished preparing the affidavit for a warrant when they learned that hospital personnel were taking the unconscious and injured defendant for medical procedures that could alter his blood-alcohol content. Under the totality of the circumstances, these exigent circumstances made it impractical for the police to obtain a search warrant and justified the blood draw. Accordingly, we reverse the trial court's suppression order and remand the case to that court for further proceedings consistent with this opinion.

## I. Facts and Procedural History

¶ 2 At around 1 a.m. on November 18, 2013, an off-duty Colorado State University police officer who lived in the Dry Creek neighborhood of Fort Collins called the police to report a noise complaint. He told the police that a man and a woman were riding around on an all-terrain vehicle (ATV) and that alcohol was involved. He said that the man was driving the ATV. Officer Braun arrived on the scene and attempted to make contact with the ATV. Upon noticing the officer, the driver of the ATV sped off in another direction. The vehicle hit a roundabout, rolled, and ejected the driver and passenger. Both the man, who was identified as Ackerman, and the woman sustained serious injuries. Ackerman was transported to the Medical Center of the Rockies, while the woman went to Poudre Valley Hospital.

¶ 3 Officer Tower, who is the supervisor of the traffic unit and coordinates the Collision Reconstruction and Scene Handling (CRASH) team, was notified about the accident around 1:30 a.m. He asked Sergeant Clow, who was already at the scene, for his assessment and learned that Ackerman and the woman were seriously injured and transported to different hospitals. Officer Tower then directed an officer to go to each hospital. Officer Nace went to Poudre Valley Hospital, where the woman was pronounced dead on arrival. Officer Beaumont traveled to the Medical Center of the Rockies to "monitor [Ackerman's] situation."

¶ 4 Because the accident resulted in serious bodily injury and death, and included the driver eluding an officer, Officer Tower enacted "critical-incident protocol." The protocol dictated that the police perform both criminal and internal investigations. The internal investigation required performing interviews to ensure no police wrongdoing.

¶ 5 Officer Tower arrived on the scene around 2:20 a.m. and received a "walk-through" from Sergeant Clow. He testified that he then explained the situation to Officer Jurkofsky, who arrived soon after, and requested that Officer Jurkofsky gather information and begin writing an affidavit for a warrant to order blood drawn from Ackerman. While Officer Jurkofsky gathered information, Officer Beaumont called from the hospital and informed the investigators at the scene that Ackerman was unconscious and was in preparation for a computerized axial tomography (CAT) scan and "possibly surgery." After discussing the status of the investigation and the possibility of obtaining a warrant, Officer Tower determined that he could not get a warrant before Ackerman became unavailable. As a result, he ordered Officer Beaumont to obtain a blood draw, which hospital personnel performed around 3:30 a.m.

¶ 6 After the first blood draw, Officer Jurkofsky continued to gather information to complete the affidavit for the warrant, which the police submitted to a magistrate via an electronic, expedited warrant system. A magistrate signed the warrant at 4:37 a.m., which authorized two additional blood draws to be carried out so that the three total blood draws were each an hour apart. Ackerman, though, was in surgery at the time, which delayed the blood draws. The two additional blood draws were not performed until 5:18 and 6:25 a.m.

¶ 7 Following the police's investigation, the People charged Ackerman with vehicular homicide, vehicular eluding involving death, driving under the influence, driving under the influence per se, and reckless driving. Ackerman pleaded not guilty on all counts and moved to suppress the results from the three blood draws.[1]

¶ 8 At the suppression hearing, the trial court found that the police had probable cause to proceed with the first blood draw. It noted that there was alcohol involved in a fatal accident, that Ackerman was the driver of the ATV, and that a blood test would produce evidence of Ackerman's intoxication level. Nevertheless, the trial court found that no exigent circumstances existed that made obtaining a warrant impractical. It reasoned that Officer Tower had "sufficient time to get a warrant" through the expedited warrant system because there were approximately two hours between the accident and the first blood draw and an hour between the officer's arrival on the scene and the first blood draw. It stated that the police's failure to obtain this warrant was due to "a breakdown in procedures" and "didn't really have anything to do with the surgery." Thus, the court granted the motion to suppress the results from the first blood draw. As to the second and third blood draws, the trial court, after reviewing the affidavit for probable cause for a search warrant, found that the totality of the circumstances supported a finding of probable cause that Ackerman committed a crime and denied the motion to suppress the results from those blood draws.

1. An analysis of the sample from the first blood draw showed that Ackerman's blood-alcohol content was .190. The second and third blood draws showed a blood-alcohol content of .140 and .113, respectively.

2. Section 16–12–102(2), C.R.S. (2014), allows the prosecution to file an interlocutory appeal after the trial court grants a motion to suppress evidence if the prosecution "certifies to the judge who granted such motion and to the supreme court that the appeal is not taken for the purposes of delay and the evidence is a substantial part of the proof of the charge pending against the defendant." The People here filed such a certificate. In addition, the People indicated in

¶ 9 In response, the People filed this interlocutory appeal[2] and argue that the trial court erred in finding that the police lacked exigent circumstances that would justify an involuntary, warrantless blood draw.

## II. Standard of Review

¶ 10 A trial court's suppression order presents a mixed question of law and fact. *See People v. Munoz–Gutierrez*, 2015 CO 9, ¶ 14, 342 P.3d 439, 443. In our review, "[w]e defer to the trial court's factual findings that are supported by competent evidence but review the legal effect of those facts de novo." *Id.* When constitutional rights, such as the Fourth Amendment right to protection from unreasonable searches and seizures, are implicated, we examine the trial court's legal conclusions under the totality of the circumstances. *People v. Syrie*, 101 P.3d 219, 222 (Colo.2004). The trial court's legal conclusions are subject to reversal if the court applied an erroneous legal standard or if its factual findings did not support its conclusions of constitutional law. *Id.*

## III. Analysis

¶ 11 The issue is whether the trial court erred in suppressing the results from Ackerman's first blood draw when it concluded that the police lacked exigent circumstances that would justify the involuntary, warrantless blood draw. To resolve this issue, we first examine the Fourth Amendment's prohibition against unreasonable searches and seizures. We next articulate when, under the totality of the circumstances, exigent circumstances justify an involuntary, warrantless blood draw under the Fourth Amendment.

their Notice of Interlocutory Appeal that the results of the first blood draw are a substantial part of their proof of the charges against Ackerman. The blood draw was taken prior to when Ackerman underwent significant medical treatment and thus would provide the closest approximation of Ackerman's blood-alcohol content at the time of the accident. The People also anticipate using a forensic toxicologist as an expert witness. This expert will perform a retrograde extrapolation based on the results of at least three blood draws to approximate Ackerman's blood-alcohol content at the time of the accident. The inability to reference the results of the first blood draw would negatively affect the expert's analysis.

We then apply the law to the facts of this case and hold that exigent circumstances justified the blood draw at issue.

### A. The Law of Warrantless Blood Draws

■ ¶ 12 The Fourth Amendment to the United States Constitution and article II, section 7 of the Colorado Constitution protect a person's right to be free from unreasonable searches and seizures. U.S. Const. amend. IV; Colo. Const. art. II, § 7; *see, e.g., People v. Hopkins,* 870 P.2d 478, 480 (Colo.1994). A blood draw qualifies as a search that is "'subject to the protections of the Fourth Amendment.'" *Grassi v. People,* 2014 CO 12, ¶ 23, 320 P.3d 332, 338 (quoting *People v. Schall,* 59 P.3d 848, 851 (Colo.2002)); *see also Schmerber v. California,* 384 U.S. 757, 767, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (reasoning that blood draws "plainly constitute searches of 'persons,' and depend antecedently upon seizures of 'persons,' within the meaning of [the Fourth] Amendment"). If a blood draw violates the Fourth Amendment, then its results constitute fruit of the poisonous tree and must be suppressed based on the exclusionary rule. *Schmerber,* 384 U.S. at 766–67, 86 S.Ct. 1826; *Mapp v. Ohio,* 367 U.S. 643, 660, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (holding that the exclusionary rule must be applied in state courts).

¶ 13 In *Schmerber,* the United States Supreme Court articulated four criteria for determining when involuntary, warrantless blood draws may satisfy the Fourth Amendment in cases involving alcohol-related driving offenses. 384 U.S. at 770–72, 86 S.Ct. 1826. We adopted the criteria in *People v. Sutherland,* 683 P.2d 1192, 1194 (Colo.1984), where we described the four criteria as probable cause, relevance, exigent circumstances, and reasonableness:

> First, there must be probable cause for the arrest of the defendant on an alcohol-related driving offense. Second, there must be a clear indication that the blood sample will provide evidence of the defendant's level of intoxication. Third, exigent circumstances must exist which make it impractical to obtain a search warrant. Fourth,

the test must be a reasonable one and must be conducted in a reasonable manner.

The second and fourth criteria are usually established in these cases. Blood draws are "a highly effective means of determining the degree to which a person is under the influence of alcohol." *Schmerber,* 384 U.S. at 771, 86 S.Ct. 1826. Similarly, blood draws performed by hospital personnel are usually done in a reasonable manner. *Id.* at 771–72, 86 S.Ct. 1826. Thus, these cases often turn on the whether there was probable cause and whether exigent circumstances existed that justified an involuntary, warrantless blood draw. *See, e.g., Schall,* 59 P.3d at 851–53 (applying the *Sutherland* test and focusing the majority of the analysis on the probable cause criterion).

### B. Exigent Circumstances

¶ 14 The United States Supreme Court discussed exigent circumstances as they relate to involuntary, warrantless blood draws in *Schmerber.* In that case, a police officer directed a physician to take a blood sample from the defendant, who was arrested at the hospital while he received treatment for injuries he had sustained while driving in a vehicle. *Schmerber,* 384 U.S. at 758–59, 86 S.Ct. 1826. The sample showed that the defendant was intoxicated. *Id.* at 759, 86 S.Ct. 1826. At trial, the defendant, who was subject to a statutory implied-consent law, objected to the admission of this evidence on multiple bases, including the Fourth Amendment right not to be subjected to unreasonable searches and seizures. *Id.* In analyzing the search and seizure claim, the Court articulated that an involuntary, warrantless blood draw constitutes a search that could create a Fourth Amendment violation, but that, under the totality of the circumstances, situations may exist that would justify the blood draw. *Id.* at 770–72, 86 S.Ct. 1826. It then explained that because the percentage of alcohol in the bloodstream diminishes with time, and because valuable time was lost while the defendant was transported to the hospital and the police investigated the accident scene, exigent circumstances existed that justified the involuntary, warrantless blood draw. *Id.* at 770–71, 86 S.Ct. 1826. Thus, the Court concluded that the record did not

show a violation of the defendant's Fourth Amendment rights. *Id.* at 772, 86 S.Ct. 1826. The Court limited its holding to the facts of that case. *Id.*

¶ 15 We applied *Schmerber* and the *Sutherland* test in later blood draw cases. In *People v. Milhollin*, 751 P.2d 43, 48–49 (Colo. 1988), we cited both cases and stated that exigent circumstances existed in a drunk driving case because the suspected drunk driver's blood-alcohol content would naturally dissipate with time, the driver was transported to a hospital, and the investigating officer was at the accident scene. Likewise, in *People v. Shepherd*, 906 P.2d 607, 608–10 (Colo. 1995), we held that exigent circumstances made obtaining a warrant impractical when the driver was at the hospital receiving medical treatment, officers continued to investigate the accident scene, the officer at the hospital was unable to obtain a sobriety test, and the driver was about to be airlifted to a hospital in another part of the state. *See also Schall*, 59 P.3d at 853.[3]

¶ 16 In addition, we have adopted the totality-of-the-circumstances approach as applied in *Schmerber* in a variety of cases discussing when exigent circumstances justify an involuntary, warrantless search. *See People v. Drake*, 785 P.2d 1257, 1264 (Colo. 1990) ("The determination that a warrantless search or seizure is justified under the exigent circumstances doctrine must be based on a consideration of the totality of circumstances confronting the police officers at the time the warrantless search or seizure is made."). For example, in *People v. Brunsting*, 2013 CO 55, ¶¶ 24–32, 307 P.3d 1073, 1079–81, we discussed exigent circumstances in the context of the immediate needs of officers to protect their own safety. In so doing, we reasoned that the United States Supreme Court's cases that discuss exigent circumstances articulate "a flexible exception that is measured by a fact-specific reasonableness inquiry" and cover many possible situations. *Id.* at ¶ 28, 307 P.3d at 1080. We also have recognized three types of exigent circumstances that justify a warrantless search. *People v. Aarness*, 150 P.3d 1271, 1277 (Colo.2006). The three situations occur when: "(1) the police are engaged in a 'hot pursuit' of a fleeing suspect; (2) there is a risk of immediate destruction of evidence; or (3) there is a colorable claim of emergency threatening the life or safety of another." *Id.* (quoting *People v. Kluhsman*, 980 P.2d 529, 534 (Colo.1999)). For exigent circumstances to exist in a situation where "there was a risk of immediate destruction of evidence, the police must have an articulable basis upon which to justify a reasonable belief that evidence [was] about to be destroyed." *Id.* at 1278.

## C. Application

¶ 17 In our application, we follow the four criteria in the *Sutherland* test to determine when an involuntary, warrantless blood draw was justified under the Fourth Amendment based on exigent circumstances. In this case, three of the four criteria are not in dispute on appeal. The trial court found that probable cause existed and that the blood sample would show Ackerman's level of intoxication. Neither party disputes that the blood draw itself was conducted reasonably. Thus, only the third criterion—exigent circumstances—is at issue in this case.

¶ 18 In finding that exigent circumstances did not exist, the trial court relied on the facts that a system of electronic warrants was in place and that there was at least an hour between Officer Tower's arrival on the scene and the first blood draw. The trial court discounted the fact that the police learned of Ackerman's impending surgery shortly before it was to begin and instead characterized the delay in obtaining a warrant as a breakdown of communication between officers. With the benefit of hindsight, the court knew approximately when Ackerman was unavailable for a blood draw because he underwent surgery. Had the police known when they started the investigation that Ackerman would go into surgery at a specific time and be unavailable for a

---

3. This case does not involve the debate from *Missouri v. McNeely*, —— U.S. ——, 133 S.Ct. 1552, 185 L.Ed.2d 696 (2013), discussed in *People v. Schaufele*, 2014 CO 43, ¶ 32, 325 P.3d 1060, 1066 (plurality opinion), over whether to adopt Chief Justice Roberts's "proposed modified per se rule" approach to the totality of the circumstances test.

blood draw, the trial court's reasoning would be correct. That, however, was not the case. Therefore, while the trial court made factual findings on the circumstances surrounding the first blood draw, it did not take into consideration all of the relevant facts, and its factual findings do not support its conclusion that no exigent circumstances existed that would justify the blood draw.

¶ 19 In our analysis, we look at the totality of the circumstances to determine whether exigent circumstances made it impractical for police to obtain a warrant without significantly undermining the efficacy of the search. Important considerations in this analysis include the chronology of events, including when the police learned of Ackerman's potential surgery; the extensiveness of the police investigation; the location of the defendant; and the availability of an expedited warrant process.

¶ 20 The trial court's factual findings on the chronology of the events leading up to the first blood draw show that Officer Tower had to make a quick decision based on the available information to order a blood draw. Officer Tower arrived at the accident site at approximately 2:20 a.m. and ordered the blood draw approximately an hour later. Before and after he arrived on scene, he gathered information from Sergeant Clow about the accident, including that an ATV had crashed, "alcohol may [have been] involved," a female passenger was in serious condition and could die, and the male driver was seriously hurt. Officer Tower sent officers to the hospitals where the passenger and Ackerman were transported. Because a blood draw from Ackerman would be needed for evidence, Officer Tower "[had] to make some decisions ... fairly quickly," and "one of the things Officer Tower did conclude very quickly was that a warrant should be obtained." The affidavit for a warrant was not finalized before Officer Tower learned that Ackerman was going into surgery, so Officer Tower ordered the first blood draw, which occurred at approximately 3:30 a.m. Ackerman then had surgery at some point between the first blood draw and the second blood draw, which was taken at 5:18 a.m.

¶ 21 These facts demonstrate exigent circumstances. Officer Tower knew that Ackerman's blood-alcohol content would be essential evidence because his investigation led him to believe that alcohol was involved in the accident and that Ackerman was the driver of the crashed ATV. To obtain a blood sample, Officer Tower tried "to get [a] warrant in a timely manner." Nevertheless, the police had not completed writing the affidavit by the time Officer Tower was informed that Ackerman was headed for a CAT scan and surgery. At the time he ordered the first blood draw, it was unclear how long surgery would last. Because the "percentage of alcohol in the blood begins to diminish shortly after drinking stops," *Schmerber*, 384 U.S. at 770, 86 S.Ct. 1826, a lengthy surgery could have resulted in a delay that significantly diminished the sample's blood-alcohol content. The impending medical procedures also might have altered the alcohol content in Ackerman's blood and adversely affected the accuracy of the results.

¶ 22 Additionally, similar to the situations in *Milhollin, Shepherd,* and *Schall,* where the defendants were transported to the hospital for medical procedures and the officers were unable to perform sobriety tests, Ackerman was transported to the hospital for unknown injuries prior to administration of any field sobriety tests or even police observation, and the only way to determine Ackerman's blood-alcohol content was a blood test. Thus, the trial court's conclusion that Officer Tower's decision to order the blood draw "didn't really have anything to do with the surgery" is not supported by the chronology of events. In fact, the surgery played a crucial role in the decision because it created an imminent loss of access to Ackerman and the potential destruction of critical evidence.

¶ 23 In addition, the police's investigation and Ackerman's move to the hospital delayed the officers' ability to obtain a search warrant. Like the officers in *Milhollin, Shepherd,* and *Schall,* who were tasked with investigating the accident scenes while the suspects were at the hospital, Officer Tower and his staff remained at the accident scene when Ackerman went to the hospital. Here, the police were tasked with investigating a

scene that had involved a potentially fatal accident, a suspect who had tried to flee police in an ATV, two vehicle occupants with significant injuries who had been transferred to different hospitals, and the need to invoke the "critical-incident protocol" that required both external and internal investigations. The investigations involved officers from the CRASH team, which inspects and reconstructs vehicle accidents. Thus, like the officers in *Schmerber*, who investigated an accident involving a car that skidded, crossed a road, struck a tree, and caused both the driver—who had been drinking—and a passenger to go to the hospital with injuries, 384 U.S. at 758 n. 2, 86 S.Ct. 1826, the police in this case had to document and preserve a crime scene, interview witnesses, attempt to reconstruct the accident, and cope with the ATV's occupants going to different hospitals for emergency medical treatment. While the complexity of an investigation alone may not justify an involuntary, warrantless blood draw, such legitimate logistical challenges must be considered in evaluating exigency under the totality of the circumstances.

¶ 24 Moreover, even though the police had to perform all those tasks, Officer Tower initiated steps to obtain a warrant for a blood draw before changed circumstances forced his hand. On his way to the accident scene, Officer Tower asked that an officer meet Ackerman at the hospital and monitor his situation. When Officer Tower next decided that a blood draw was necessary, he asked Officer Beaumont, who had met Ackerman at the hospital, to complete the affidavit for a warrant. Officer Beaumont, though, lacked the necessary information to complete the affidavit, so Officer Tower instructed Officer Jurkofsky, who was at the accident scene, to write the affidavit instead. While Officer Jurkofsky was gathering information and writing the affidavit for the warrant, Officer Tower learned that Ackerman was about to receive a CAT scan and possibly undergo surgery. Faced with the possibility of Ackerman becoming unavailable for an unknown period of time and having his blood tainted by medical procedures, it was reasonable for Officer Tower to believe that he needed to proceed with a blood draw to preserve the evidence. *See Schmerber*, 384 U.S. at 770, 86

S.Ct. 1826. Additionally, the fact that Officer Tower had Officer Jurkofsky finish the affidavit for the second and third blood draws, even after the first blood draw was completed, is evidence that the officers attempted to obtain a warrant as expeditiously as they could under the circumstances.

¶ 25 Finally, although an expedited warrant process was available, the police had only two hours after the accident occurred and about an hour once Officer Tower had arrived on scene to complete all of their tasks and write the affidavit. Courts expect an affidavit describing probable cause in support of a warrant to be complete and accurate. The trial court might have been correct that in the abstract there was enough time for police to obtain a warrant, but this is a conclusion reached with the benefit of hindsight. Here, at the time of the first blood draw, the officers harbored a reasonable concern that Ackerman's impending surgery might compromise the integrity of critical evidence. The existence of an expedited warrant process did not render the officers' course of action unreasonable.

¶ 26 We conclude that, when considering the totality of the circumstances, exigent circumstances showed that it would have been impractical for the police to obtain a warrant without significantly undermining the efficacy of the search. Although an expedited warrant process was available, the imminent unavailability of Ackerman for a blood sample presented circumstances that showed the police had a reasonable belief that evidence pertaining to Ackerman's blood-alcohol content might have been altered or destroyed by the impending medical procedures. Therefore, exigent circumstances justified the involuntary, warrantless blood draw in this case.

## IV. Conclusion

¶ 27 For the foregoing reasons, we hold that exigent circumstances existed where the police were still investigating the scene of the crime and were not finished preparing the affidavit for a warrant when they learned that hospital personnel were taking the un-

conscious and injured defendant for medical procedures that could alter his blood-alcohol content. Under the totality of the circumstances, these exigent circumstances made it impractical for the police to obtain a search warrant and justified the blood draw. Accordingly, we reverse the trial court's suppression order and remand the case to that court for further proceedings consistent with this opinion.