Opinion by JUDGE ROMÁN
¶ 1 Should statements made by a defendant in the course of an unconstitutional blood draw be suppressed as fruit of the poisonous tree? We conclude that the trial court correctly determined based on the particular facts of this case that statements made by defendant, Roger Louis Archuleta, were admissible. We also conclude there was no reversible error in the challenged jury instructions or admission of evidence. We therefore affirm the judgment of conviction.
I. Background
¶ 2 According to the prosecution's evidence, surveillance video in the housing facility where the victim was staying with defendant showed the following events. Defendant and the victim left defendant's apartment around seven in the morning on December 5, 2012. The victim did not appear to be injured when he returned home around noon. Defendant *236 returned a short time later, made a few other brief outings that afternoon, then remained in the apartment the rest of the night. No one besides the victim and defendant entered or left the apartment that day.
¶ 3 That night, other residents and visitors to the housing facility heard loud noises. At about four in the morning on December 6, 2012, surveillance video showed defendant dragging the victim's body out of his apartment into the hallway. A few minutes later, surveillance video showed defendant dragging the victim's body back into his apartment. Defendant then informed a residential aide at the housing facility that he had a body in his apartment that needed to be removed. The manager then contacted the police.
¶ 4 When the police arrived at defendant's apartment, they found the deceased victim lying just inside the door, covered by a blanket. The police observed the victim had blood on him and appeared to have been beaten. They also found defendant seated on a mattress in the living room, apparently highly intoxicated and with a substantial amount of dried blood on his face and hands. Defendant mumbled "he died" and that it wasn't defendant's fault.
¶ 5 Police discovered that all four walls in the apartment bedroom were spattered with blood. According to the prosecution's blood spatter and bloodstain analysis expert, the state of the bedroom was potentially consistent with a physical altercation between two people.
¶ 6 The police took defendant to the police station; advised him of his rights under Miranda v. Arizona , 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ; and interviewed him. They also took pictures of him, collected his clothing, and took swabs of suspected blood. Defendant ended the interview at the police station by indicating he wanted to speak to an attorney.
¶ 7 Without obtaining a court order or defendant's consent, police took defendant to the hospital, where three samples of his blood were drawn at one hour intervals. A doctor also examined defendant's finger at his request. After that, defendant was taken to the jail, where he was booked in, and fingernail clippings and swabs of his DNA were taken pursuant to a court order.
¶ 8 Defendant was charged with second degree murder and first degree assault. The trial court determined that the police had unconstitutionally ordered that samples of defendant's blood be taken. That determination is not being appealed.
¶ 9 The jury found defendant guilty as charged.
¶ 10 On appeal, defendant contends that his convictions must be reversed because under the fruit of the poisonous tree doctrine, the trial court erred by failing to suppress statements he made in the course of his transport to and detention at the hospital for his blood draws. Defendant also maintains that his convictions must be reversed because there were errors in the jury instructions and because the trial court improperly elicited and admitted testimony from the prosecution's blood spatter analysis expert that his conclusions were independently verified. We reject these contentions.
II. Fruit of the Poisonous Tree Doctrine
¶ 11 As a matter of first impression, defendant argues that the statements made while he was forced to undergo the unconstitutional blood draws should be suppressed because but for the illegal search, he would have been placed in a cell rather than being forced to continue interacting with the police officers. We disagree.
A. Defendant's Statements
¶ 12 To put the challenged statements into context with their relationship to the blood draws, we begin with a summary of the evidence on the recordings of defendant from the time he left the police department to the conclusion of his hospital visit. This summary is drawn from the evidence at the suppression hearing but was not all introduced at trial.
¶ 13 After being interviewed at the police station, defendant was handcuffed in order to be taken to the hospital for blood draws. Defendant was uncooperative-cursing, insulting, and apparently threatening the police *237 officer when he refused to loosen or remove the handcuffs. When defendant heard the police officer discussing the blood draws, defendant said he was not consenting. Medical personnel came in to draw the first blood sample, but defendant refused and again demanded to be uncuffed.
¶ 14 Defendant offered to cooperate with the blood draw if the handcuffs were removed. The police agreed and removed the cuffs. Defendant was then so cooperative that one of the two officers assigned to him stepped out of the room for much of the hospital visit.
¶ 15 When the police informed defendant he would be waiting about an hour in the hospital for another blood draw, defendant said he needed to lie down. The police brought a bed into the room and found a blanket for him. They had not asked defendant questions or encouraged him to talk to them.
¶ 16 Nonetheless, defendant initiated various conversations with the officers during the next two hours at the hospital. He rambled about his strained relationship with his nephew, his long history as a boxer, and the evils of methamphetamine use, as well as inquiring about an officer's holiday plans. More importantly, woven throughout these conversations, defendant made numerous unprompted comments that seemed to relate to the victim's death. Although the police repeatedly reminded defendant that he had invoked his Miranda rights, he continued to ramble.
¶ 17 Defendant blurted that "you guys got me" and "let's go to jail." A short time later, defendant told the police, "[I]t's f* * *ed up shit. And I can't live with it. Can't live with it.... At my age I'd rather kill myself than do more time. This situation is f* * *ed up and I'm here to tell you about it." Defendant later added, "[I]f I did that, then I deserve to die." Later, defendant commented, "I'm in trouble. I know what's going on. But it wasn't my fault you know. I found him like that." He even gave an account of the night in question, indicating that he had come home to find the victim, all beat up, in the hall outside his apartment, so he dragged the victim into his apartment, but he was already dead, so defendant called the police.
¶ 18 At one point, the officer left the room to get defendant water, but one recorder remained on in the room. Defendant is heard on the recording saying: "Shit. [Victim's name]. You're dead, you're dead brother. I killed you."
¶ 19 Throughout the hospital visit, the police mentioned the blood draws only in response to defendant's inquiries. They explained that they would remain at the hospital for a couple of hours to complete the blood draws and that the purpose was to figure out what was in defendant's system.
¶ 20 The police then took defendant to the jail where they executed a Crim. P. 41.1 warrant, collecting nail clippings and swabs of his DNA.
B. Trial Court Ruling
¶ 21 The trial court agreed with defendant that the blood draws, taken without a search warrant or defendant's consent, violated defendant's constitutional rights. The court thus suppressed the results of the blood test. However, the trial court rejected defendant's argument that the statements he made at the hospital were likewise inadmissible:
The fruit of the illegal search is the blood test results. It is entirely speculative whether the Defendant would have continued to make statements if he had been transferred to the jail rather than the hospital. As stated earlier in this Order, the vast majority of Defendant's statements were spontaneous and not a result of interrogation. Defendant would have remained in police custody throughout the booking process and the execution of the Order of the Court for Non-Testimonial Identification pursuant to Colo. R. Crim. P. 41.1. The Court does not find that his statements at the hospital are the fruit of the illegal search.
C. Legal Standards
¶ 22 "A trial court's suppression order presents a mixed question of law and fact." People v. Ackerman , 2015 CO 27, ¶ 10, 346 P.3d 61. Accordingly, we defer to the trial court's factual findings so long as they *238 are supported by the record, but we review the legal effect of those facts de novo. Id.
¶ 23 The exclusionary rule "is a judicially created remedy designed primarily to deter unlawful police conduct." People v. Schoondermark , 759 P.2d 715, 718 (Colo. 1988). Under the rule, evidence that has been obtained in violation of the Fourth Amendment may not be presented in the government's case-in-chief. Id. "The exclusionary rule applies both to the illegally obtained evidence itself and to the 'fruit of the poisonous tree'-any other evidence derived from the primary evidence." Id.
¶ 24 At the outset, a "defendant ... bears the burden of demonstrating 'a factual nexus between the illegality and the challenged evidence.' " United States v. Nava-Ramirez , 210 F.3d 1128, 1131 (10th Cir. 2000) (quoting United States v. Kandik , 633 F.2d 1334, 1335 (9th Cir. 1980) ); see also Alderman v. United States , 394 U.S. 165, 183, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969) ("The United States concedes that when an illegal search has come to light, it has the ultimate burden of persuasion to show that its evidence is untainted. But at the same time petitioners acknowledge that they must go forward with specific evidence demonstrating taint."). In other words, a defendant must demonstrate the causal connection between the illegality and the evidence sought to be suppressed as fruits of the illegality. See Brown v. Illinois , 422 U.S. 590, 602, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) ; see also New York v. Harris , 495 U.S. 14, 19, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990) (Before going on to consider whether an exception to the fruit of the poisonous tree doctrine applies, "as a threshold matter, courts [must] determine that 'the challenged evidence is in some sense the product of illegal government activity.' " (quoting United States v. Crews , 445 U.S. 463, 471, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980) )).[1]
D. Analysis
¶ 25 Here, defendant failed to establish a causal connection between the illegality of the warrantless blood draws and the challenged statements. Therefore, the trial court properly denied his motion to suppress his statements as fruit of the poisonous tree.
¶ 26 Defendant points to four sets of statements that he contends should not have been admitted into evidence at trial: (1) his statement, when alone in the hospital room, that he killed the victim; (2) the initial portion of the recording during which defendant cursed at officers and was told not to threaten them; (3) defendant's explanation that he found the victim in the hallway; and (4) defendant's description of his experience as a boxer.
1. There is No Dispute That Defendant Was in Legal Custody
¶ 27 In considering this issue, we find instructive the Supreme Court's decision in New York v. Harris , 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990). In that case, police officers had probable cause to believe the defendant had murdered someone, and they went to his apartment to take him into custody, without obtaining a warrant. Id. at 15, 110 S.Ct. 1640. The defendant admitted to the murder while still at the apartment and then signed a written inculpatory statement at the stationhouse. Id. at 16, 110 S.Ct. 1640. The trial court suppressed the statement made in the apartment. Id. The Supreme Court considered whether the stationhouse statement should have also been suppressed because the police violated the defendant's Fourth Amendment rights by entering his home without a warrant or consent in order to arrest him. Id.
¶ 28 The Supreme Court noted that the police had probable cause to arrest the defendant and he was not unlawfully in custody when he gave the stationhouse statement. Id. at 18, 110 S.Ct. 1640. The Court therefore distinguished the situation from cases in which evidence was suppressed because it *239 was obtained from defendants following arrests not based on probable cause. Id. at 18-19, 110 S.Ct. 1640. The Court held that the stationhouse statement was admissible because the defendant "was in legal custody ... and because the statement, while the product of an arrest and being in custody, was not the fruit of the fact that the arrest was made in the house rather than someplace else." Id. at 19-20, 110 S.Ct. 1640.
¶ 29 Defendant did not argue, either in the trial court or on appeal, that his custody was not based on probable cause; rather, defendant argues his statements should be suppressed as the fruit of an illegal search, not an illegal custody. Because it is not disputed that defendant in this case was in legal custody, we are unpersuaded by his reliance on People v. Lewis , 975 P.2d 160 (Colo. 1999). There, our supreme court affirmed suppression of an out-of-court identification because the defendant was only "present for viewing as the direct result of" his unlawful arrest that was not based on probable cause. Id. at 172. Unlike in Lewis , because here the police lawfully had custody of defendant during transport to and at the hospital, he was not in the presence of the police solely because of the illegal blood draws.
2. Whether the Challenged Statements Are Causally Connected to the Unconstitutional Blood Draws
¶ 30 Nevertheless, just as the Supreme Court in Harris considered whether a defendant's statement was the fruit of an arrest illegally made in his home, we must determine in this case whether the challenged statements are the fruit of the illegal search. See Ackerman , ¶ 12 (blood draw is a search under Fourth Amendment).
¶ 31 In so doing, we recognize that our supreme court, in Perez v. People , 231 P.3d 957 (Colo. 2010), applied the analysis in Harris to conclude that a defendant's statements were the fruit of an illegal search. In that case, a police officer stopped Perez for a traffic infraction and arrested him based on an outstanding warrant discovered in the course of the stop. Id. at 959. The officer searched the car Perez had been driving and discovered baggies of methamphetamine. Id. Seated in the back of the patrol car, Perez saw the officer remove the drugs. Id. On the drive to the police station, Perez admitted that the drugs were his and that he had planned to sell them. Id.
¶ 32 The Perez court held that evidence of the drugs found in the car had to be suppressed. Id. at 960-62. It went on to hold that Perez's statements also had to be suppressed because "Perez's confession to the arresting officer in the police cruiser was the direct result of the officer's illegal search." Id. at 964. The court noted that "in cases where confessions follow an illegal search, the confession is often elicited solely because of the illegal search-a defendant sees that an officer has obtained the incriminating evidence and then speaks. The causal connection between the illegal search and the confession is a tight one." Id. (citation omitted).
¶ 33 Considering the particular facts of the case before us, however, we conclude that, unlike Perez , this is not a case in which a defendant's statements were elicited because of an illegal search and thus must be suppressed. Here, the record supports the trial court's finding that defendant's statements were not prompted by the trip to the hospital or anticipation of the blood draws themselves, or by anticipation of what the results of the blood test might show.[2] This case is unlike the common situation evincing a "tight" causal connection in Perez where the evidence recovered implicates the defendant in a crime regarding which the defendant then makes incriminating statements. Instead, the presence of alcohol or drugs in defendant's blood here would not implicate him in the murder or assault of the victim.[3]
*240 Nor did the police ever suggest that the results could implicate him in a crime.
¶ 34 Although defendant argues that his belligerence was a direct result of the blood draws, this is not borne out by the evidence.[4] Defendant also became agitated at various times at the police station prior to going to the hospital. Additionally, defendant's verbal attacks were related primarily to being handcuffed-his agitation eased considerably when the handcuffs were removed.
¶ 35 The Colorado Supreme Court's decision in People v. Harris , 762 P.2d 651 (Colo. 1988), does not demand a different result. There, the defendant was taken into custody by police on less than probable cause for the limited purpose of obtaining nontestimonial identification evidence, pursuant to Crim. P. 41.1. Id. at 652. The supreme court concluded that, although Harris was legally in custody on less than probable cause for the Crim. P. 41.1 procedures, the police had violated his rights under the Fourth Amendment by "conducting a full-blown custodial interrogation, on less than probable cause." Id. at 658. The causal connection between the illegality-the custodial interrogation on less than probable cause-and the defendant's statements was clear: "In response to [the officer's] questions, the defendant provided details regarding where he had been, whom he had been with, and what he had been doing." Id. at 652. Here, in contrast, defendant's custody was supported by probable cause.
¶ 36 Defendant also relies heavily on the temporal proximity of the illegal blood draws to his challenged statements. But temporal proximity alone is not enough to establish the causal connection that a defendant must show in order to warrant application of the exclusionary rule.[5] In this case, defendant offered no specific evidence to establish that the challenged statements were derived from the illegal blood draws, rather than simply occurring within the same time frame. See Segura v. United States , 468 U.S. 796, 815-16, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) (in declining to suppress evidence seized under a valid warrant as fruit of an earlier illegal entry that the court concluded did not contribute in any way to discovery of evidence subsequently seized, the court rejected as "pure speculation" the suggestion that absent the illegal entry and securing of the premises, someone could have removed or destroyed the evidence before the warrant issued the following day); Nava-Ramirez , 210 F.3d at 1131-32 (holding that the defendant did not prove a factual nexus between his purportedly illegal continued detention (where the initial detention was valid) and evidence ultimately discovered in vehicle trunk; the defendant put on no evidence to demonstrate that the vehicle's owner would have permitted him to leave in the vehicle, and the court "c[ould ]not simply speculate" that the conditions would have occurred preventing discovery of the challenged evidence).
¶ 37 Accordingly, the trial court properly allowed into evidence the challenged statements made by defendant while he was on his way to and at the hospital for the blood draws because defendant did not show that those statements were the fruit of the illegal search.
III. Jury Instruction Defining "Cause"
¶ 38 Defendant next contends that the trial court's instruction to the jury defining "cause" misstated the law because it instructed the jury that the victim's preexisting physical condition was not a defense to the murder and assault charges. He argues that while a victim's preexisting conditions generally *241 do not impact the causation element, they are relevant to the culpable mental state. Thus, defendant asserts, the court's definition of "cause" effectively prevented the jury from considering whether, in light of the victim's preexisting conditions, defendant "knew" that death would result from his alleged conduct. We disagree.
A. Jury Instructions Given on "Cause"
¶ 39 The court instructed the jury on the elements of second degree murder, including that defendant
3. knowingly,
4. caused the death of another person.
¶ 40 The court then instructed the jury that the following definition applied to the word "cause" in the above elemental instruction:
"CAUSE" means that act which in natural and probable sequence produced the victim's death. It is a cause without which the victim's death would not have been incurred. Such a cause need not be the only cause or the last cause or the nearest cause of the victim's death. However, a defendant must take his victim as he finds him, and it is no defense that the victim was suffering from preexisting physical ailments, illnesses, injuries, conditions or infirmities.
¶ 41 The trial court further instructed the jury on the elements of first degree assault, including that defendant
3. unlawfully
4. with intent to destroy, amputate, or disable permanently a member or organ or another person's body
5. caused such injury to another person[.]
This elemental instruction was followed by a nearly identical definition of "cause," but with the word "injuries" appearing in place of the word "death."
B. Standard of Review
¶ 42 We review de novo whether a jury instruction is a correct statement of law. Day v. Johnson , 255 P.3d 1064, 1067 (Colo. 2011) ; see also People v. Reeves , 252 P.3d 1137, 1139 (Colo. App. 2010).
C. Analysis
¶ 43 According to defendant, the trial court's instruction-specifically the sentence in the definition of cause that "it is no defense that the victim was suffering from preexisting physical ailments, illnesses, injuries, conditions or infirmities"-was a misstatement of law. He argues that a victim's unusual vulnerability may factor into a defendant's mental state-whether a defendant knew or intended that a victim's serious injury or death would likely result from his conduct.
¶ 44 But the trial court did not give a stand-alone instruction stating that a victim's preexisting condition was not a defense to the charges. Rather, the statement was contained within the definition of "cause," which explicitly pertained to the "cause" elements of the two charges. Within the context of causation, a "defendant must take his victim as he finds him, and it is no defense that the victim is suffering from physical infirmities." Hamrick v. People , 624 P.2d 1320, 1324 (Colo. 1981). Thus, it is no defense that a victim who had been in good physical condition would have survived an attack; a defendant "can not be excused from guilt and punishment because his victim was weak and could not survive the torture he administered." Id. (quoting Swan v. State , 322 So.2d 485, 487 (Fla.1975) ).
¶ 45 The culpable mental states were separately enumerated elements unaffected by the definition of "cause." Thus, the limitation on the jury's use of evidence of the victim's preexisting condition was placed only on consideration of whether defendant caused the victim's injury and death, not whether defendant possessed the necessary culpable mental state. Accordingly, we reject defendant's contention that it was a misstatement of the law.[6]
*242 IV. Assertions of Plain Error
¶ 46 Next, defendant asserts that the trial court plainly erred by (1) giving an erroneous elemental instruction for first degree assault and (2) admitting hearsay testimony from the prosecution's blood spatter analysis expert. We discern no plain error.[7]
A. Review for Plain Error
¶ 47 Plain error is error that is both "obvious and substantial." People v. Miller , 113 P.3d 743, 750 (Colo. 2005). As to the obviousness, an error is plain if it is "so clear-cut, so obvious, that a trial judge should be able to avoid it without benefit of objection." People v. Pollard , 2013 COA 31M, ¶ 39, 307 P.3d 1124 ; see also Miller , 113 P.3d at 750. Even then, an error is plain only if it "so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction." Miller , 113 P.3d at 750 (quoting People v. Sepulveda , 65 P.3d 1002, 1006 (Colo. 2003) ).
¶ 48 Further, as applied to instructional error, a defendant must show (1) that the erroneous instruction affected a substantial right and (2) that there is a reasonable possibility that the error contributed to his conviction. Id.
B. Elemental Jury Instruction for First Degree Assault
¶ 49 Defendant contends that the trial court erred by giving a first degree assault instruction that did not explicitly require the mens rea element of "with intent" to apply to the cause element. We conclude that reversal is not required because any error does not amount to plain error.
¶ 50 The assault statute provides, as pertinent here: "A person commits the crime of assault in the first degree if ... [w]ith intent ... to destroy, amputate, or disable permanently a member or organ of [another person's] body, he causes such an injury to any person...." § 18-3-202(1)(b), C.R.S. 2016.
¶ 51 The jury instruction in this case stated that the elements of first degree assault included that defendant had
3. unlawfully
4. with intent to destroy, amputate, or disable permanently a member or organ or another person's body
5. caused such injury to another person[.]
¶ 52 An instruction that tracks the language of the statute, as this one did, is generally sufficient. People v. Garcia , 2012 COA 79, ¶ 49, 296 P.3d 285. Defendant asserts that the jury instruction conflicted with the language of the first degree assault statute. Although the instruction added the word "unlawfully," we do not see, nor does defendant explain, how this pertains to the error defendant asserts.
¶ 53 The instruction here also tracked the pattern jury instruction in effect at the time. See id. at ¶ 50 ("Pattern jury instructions carry weight and should be considered by a trial court."); COLJI-Crim. 3-2:02 (2008).
¶ 54 We are not persuaded, moreover, that any error in this case was obvious based on People v. Bornman , 953 P.2d 952 (Colo. App. 1997), and Auman v. People , 109 P.3d 647 (Colo. 2005). In Bornman , a division of this court concluded that an elemental instruction for theft erroneously failed to "explicitly require a finding that the defendant knew that his possession or control of the item was without the authorization of the owner." 953 P.2d at 953-54. The supreme court in Auman held that the trial court's elemental jury instruction on theft, which as in Bornman omitted the required culpable mental state from the "without authorization" element, amounted to plain error. 109 P.3d at 663-71.
¶ 55 Significantly, in Auman and Bornman , the elements other than "without authorization" were offset so that it was clear that the knowledge requirement applied to those elements but not to "without authorization." Auman , 109 P.3d at 664 ; Bornman , 953 P.2d at 953-54.[8]
*243 ¶ 56 Here, the causation element directly followed the element describing the specific intent required under the statute, with no offsetting. Thus, any error in giving this instruction was not obvious. See Garcia , ¶¶ 45-52 (concluding no plain error where elemental instruction for sexual assault omitted the mental state that defendant knew that the victim had not consented).
¶ 57 In addition, there is no reasonable possibility that the asserted instructional error contributed to defendant's conviction. Defendant's theory of defense at trial was that he did not strike the victim. Defendant points to evidence that he did not cause the victim's death-such as evidence that the victim may have died from alcohol poisoning or liver damage, or that the victim may have died from accidental blunt force trauma from falling down. But this evidence goes to whether defendant caused the victim's injuries and death, not whether he had the culpable mental state when causing the victim's death.
¶ 58 In light of the foregoing, we conclude that any instructional error was not so obvious that a district court should have been able to avoid it without benefit of objection, and further that there is not a reasonable possibility that the asserted error contributed to defendant's conviction.
C. Expert Testimony
¶ 59 Finally, we reject defendant's contention that the trial court plainly erred by eliciting hearsay testimony that the work of the prosecution's blood spatter analysis expert was independently verified.
1. Challenged Testimony
¶ 60 While going over his qualifications for blood spatter analysis, the expert testified on direct examination that because he was the only employee at the Colorado Bureau of Investigation (CBI) qualified to do bloodstain interpretation, he went to outside agencies to get his work reviewed prior to releasing his reports. The People tendered the witness as an expert in blood spatter and bloodstain analysis, and the defense objected to him being so qualified.
¶ 61 In response to the defense objection over his qualifications, the court followed up with several questions of its own, including this exchange:
THE COURT: You also stated that you have an outside agency review your work or an internal person that also is familiar with this type of analysis. Did I understand that correctly?
THE WITNESS: That's correct, yes. Due to the fact of limitations within the state laboratory of me being the only analyst within the state system, we have to go to those outside sources to have that review done by a qualified expert.
THE COURT: Does that other individual review all of the work you do or just random cases? Tell me about that.
THE WITNESS: He reviews the entire case that I give him for that bloodstain case. So all of my notes, any documentation I have generated for that particular bloodstain case, he reviews and makes sure that he draws the same conclusions and agrees with my conclusions.
THE COURT: What if he doesn't?
THE WITNESS: Then we will discuss that and determine if there is a resolution; if not, we start moving up the chain of command type of thing to determine how that will be resolved.
THE COURT: Now, does that happen in every case that you do in terms of blood spatter analysis or just random ones that you pick out and hand to this individual to look at?
THE WITNESS: No. Every case has to be what we refer to as technically reviewed.
¶ 62 Then on follow-up questioning by the prosecutor, this exchange took place:
*244 [PROSECUTOR]: [I]s it CBI's practice that the folks at base level, whether it's firearms, drug chemistry, spatter, DNA, have their product reviewed by somebody above them?
THE WITNESS: Yes. It's either a coworker-a coworker will typically do that technical review portion, and then it's also reviewed by a supervisor prior to being released. So, every report is reviewed at least twice prior to its release.
[PROSECUTOR]: So it's not just you.
THE WITNESS: No. It is not just me.
¶ 63 The trial court accepted the witness as an expert in blood spatter and bloodstain analysis, and he went on to testify about his findings and conclusions in this case.
2. Golob v. People
¶ 64 We have considered and disagree with defendant's argument that the situation in this case is precisely the same as that in Golob v. People , 180 P.3d 1006 (Colo. 2008).
¶ 65 In Golob , a CBI agent testified for the prosecution as an expert in the examination and comparison of known footwear to footwear track impressions. The agent testified that Golob's boot could have been the source of a partial shoeprint recovered at the scene of the crime and that it was "highly probable" that the boot made another recovered print. Id. at 1009. The expert also testified on direct examination to the following:
• CBI policy required any highly probable track impression identification to be independently verified by another examiner before the results were released. Id.
• Another CBI examiner independently verified his conclusions that the boot could have been the source of a recovered shoeprint and that it was highly probable that the boot made another recovered shoeprint. Id.
¶ 66 On redirect, the prosecutor again inquired about whether the expert had obtained a second opinion on his "highly probable" conclusion. Id. at 1010. Then, comparing the testimony of the agent with that of a footprint expert presented by the defense during rebuttal closing argument, the prosecutor argued: "And ask yourself who had some independent verification.... Who had the report verified?" Id.
¶ 67 The supreme court concluded that the challenged testimony that the expert's conclusions had been independently verified was inadmissible hearsay. Id. at 1011. The court reasoned that the testimony was hearsay under the facts of that case "[b]ecause the prosecutor used the non-testifying witness's independent verification to prove the truth of the matter asserted-that is, to argue in favor of the validity of [the prosecution's expert's] findings." Id.
3. Analysis
¶ 68 Here, the challenged testimony came during voir dire testing of the witness's qualifications to testify as an expert, explaining the standard procedures he followed in issuing expert opinions. Cf. id. ("The prosecutor was not using the hearsay testimony merely to describe the CBI's internal procedures as providing a basis for [the expert's] conclusions...."). Unlike in Golob , the testimony in this case was not associated with the particular results and conclusions the expert reached.
¶ 69 Further, unlike in Golob , the prosecutor here did not use the challenged testimony to argue that the jury should accept the validity of the blood spatter expert's opinion. Cf. id.
¶ 70 Moreover, even if we assume the testimony should not have been elicited, it did not "so undermine[ ] the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction." Miller , 113 P.3d at 750 (quoting Sepulveda , 65 P.3d at 1006 ). Not only was the testimony about verification in general and not relied on by the prosecution, but the conclusions reached by the expert largely addressed what types of bloodstains were found on various surfaces. Although the expert agreed that the types of stains found could be consistent with an altercation, he also acknowledged that "there's a number of possibilities how those could have been deposited at the scene."
*245 ¶ 71 Thus, any error in allowing testimony that the expert's work was independently verified was not obvious and does not cast doubt on the reliability of the judgment of conviction.
V. Conclusion
¶ 72 The judgment of conviction is affirmed.
Lichtenstein and Márquez* , JJ., concur

If the defendant establishes the causal connection, the People may seek to prove that the evidence should nonetheless be admissible under one of three doctrines-independent source, attenuation, or inevitable discovery-"even though [the evidence] is derived from information obtained in violation of the [F]ourth [A]mendment." People v. Schoondermark , 759 P.2d 715, 718 (Colo. 1988).

Defendant did make certain statements regarding the blood draws and the likely results; however, these statements were not admitted at trial and were not related to the admitted statements other than by temporal proximity.

As defendant noted in his motion to suppress evidence resulting from the blood draws, he was not suspected of an alcohol-related driving offense, his consumption of alcohol was not unlawful, and evidence of intoxication is not evidence of homicide or of defendant's guilt in a homicide.

To be sure, defendant announced his lack of consent to the blood draws at one point in the audio recording. This statement was not admitted at trial, however.

For example, temporal proximity was insufficient to require the suppression of evidence in State v. Cardell , 180 Or.App. 104, 41 P.3d 1111 (2002). There, the Oregon Court of Appeals declined to suppress evidence obtained immediately following an unlawful search of an unoccupied car outside a residence. Id. at 1113-18. Although the evidence obtained directly from the illegal search was suppressed, the defendant did not meet his burden to establish that the evidence obtained when the officer went to the residence immediately following the unlawful search-statements from the defendant and others, as well as the results of field sobriety tests administered to the defendant-was derived from the illegal search. Id.

Although we do not conclude this jury instruction misstated the law, we do not necessarily approve of the particular language.

The People assert that the defense tendered the elemental first degree assault instruction and ask us to apply the invited error doctrine. However, our review of the cited portions of the record does not convince us that the defense tendered the elemental instruction. Accordingly, we apply plain error analysis.

The instruction in Auman v. People read, in pertinent part, as follows:
(3) knowingly,
(a) obtained or exercised control over,
(b) anything of value,
(c) which is the property of another,
(4) without authorization , or by deception, and
(5) with intent to permanently deprive the other person of the use or benefit of the thing of value.
109 P.3d 647, 664 (Colo. 2005). The instruction in Bornman was similar in pertinent part to the Auman instruction. See People v. Bornman , 953 P.2d 952, 953-54 (Colo. App. 1997).

Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5 (3), and § 24-51-1105, C.R.S. 2016.